UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LANDMARK-INDIANA LIMITED PARTNERSHIP, LANDMARK-INDIANA LIMITED PARTNERSHIP ASO/TRUSTEE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 1:13-cv-00632-SEB-MJD |
| vs. | ) ) | |
| CITY OF INDIANAPOLIS, INDIANAPOLIS POWER & LIGHT COMPANY, | ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

This matter comes before us on Defendant Indianapolis Power & Light Company's

Motion for Summary Judgment on the claims of Plaintiff Landmark-Indiana Limited

Partnership ("Landmark"). [Dkt. No. 94.] IPL's Motion is DENIED because genuine

issues of material fact preclude the entry of judgment as a matter of law.

**Background and Facts[1]**

Plaintiff Landmark's subbasement premises located at 50 N. Illinois Street in

Indianapolis suffered water damage from a leak in the ceiling. Directly above Landmark's

_____

[1] Landmark is reminded of Southern District of Indiana Local Rule 56-1(b). Local Rule 56-1(b) requires that a non-movant's response "include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Contrary to the rule, Landmark included disputed facts in its argument section, making it more difficult to identify whether and which facts are in dispute.

subbasement is a transformer vault which is directly below a public sidewalk.  On May 10, 2011, water entered into the subbasement, two of Landmark's transformers failed, and Landmark's property suffered a 30-hour power outage (the "Incident").  Landmark alleges that the transformer vault was owned and maintained by IPL and that IPL was negligent in maintaining the vault which caused the leak resulting in damage to Landmark's subbasement and equipment.

IPL moves for summary judgment on the basis that it owed no duty to Landmark, that Landmark caused the damage to its subbasement and equipment, and that Landmark voluntarily incurred the risk of the damage of which it now complains.  Landmark contends that reasonable minds could differ as to whether IPL owned and/or controlled the vault, whether IPL assumed a duty to protect Landmark's equipment, and whether IPL's maintenance of the vault caused the damage.

**The Blocks Building and the Vault.**

Landmark is the owner of property located at 50 N Illinois Street, Indianapolis, Indiana 46204 (the "Blocks Building").  [Compl. ¶ 1].  A transformer vault (the "Vault") which houses transformers owned by IPL is located under the public sidewalk outside the Blocks Building.  [*Id.* at ¶¶ 1-3].  The Vault includes four bays with a floor drain in each bay.  [Ex. H, Affidavit of Richard Schimizze ("Schimizze Aff.") ¶ 4 (expert report at Ex. H-2 at p. 7, 11, 14).]  The area of the Vault at issue here was the western-most bay.  [*Id.*]  Situated directly underneath the Vault is Landmark's subbasement such that the subbasement's ceiling is the Vault's floor.  [Ex. B, Deposition of Merlin Eugene King (referred to by the parties as "Gene King") ("King Dep.") at 33-34].  The subbasement

includes an electrical equipment room (the "Electrical Room") in which switchgears providing electricity for the entire Blocks Building are stored. *Id.*

The Vault is completely open to the elements from above; it is located under a public sidewalk and "sealed" at the top by a locked metal gate. [Schimizze Aff. ¶ 4 (expert report at Ex. H-2).] IPL owns the Vault as a utility within the right-of-way of the City of Indianapolis. [Ex. 1, Affidavit of William M. Norman, P.E. ("Norman Aff.") (expert report at p. 4).][2] IPL's engineer and expert witness Richard Schimizze testified: "[m]y understanding is, and I haven't researched this, but my understanding is that IPL owns the vault." [Ex. 7 (permit identifying IPL as the vault owner at 121 W. Market); Deposition of Richard Schimizze ("Schimizze Dep.") at 113.][3]

**Design and Maintenance of the Vault.**

IPL designed and constructed the Vault at issue and detailed a drain replacement in the 1930s and 1950s. [Deposition of David Lufcy ("Lufcy Dep.") at 23-24; Exs. 7-10 (permit and construction drawings).] The drawings associated with IPL's 1956 remodeling of the transformer vaults at the Blocks include details for drainage and waterproofing.

---

[2] On March 2, 2015, months after the summary judgment briefing was concluded, IPL filed a Motion to Exclude Expert Testimony related to Landmark's expert witness William Norman. [Dkt. No. 115.] That motion relates to Mr. Norman's trial testimony. IPL made no objection to Mr. Norman's opinions with respect to the summary judgment briefing. We will issue an order on IPL's Motion to Exclude separate from this order.

[3] A permit from 1956 from of the City of Indianapolis to "remodel transformer vault" at 121 W. Market indicates "Power and Light Company" is the "Owner." [Frank Dep. at 19-20.] Although neither party raises the issue, the location of the Blocks Building is 50 N. Illinois Street. Landmark does not explain how a permit for 121 W. Market Street is relevant to property at 50 N. Illinois Street, although the court notes that 50 N. Illinois Street and 121 W. Market Street occupy the same city block. It is our assumption that these two addresses describe the same property.

[Deposition of Thomas P. Frank ("Frank Dep.") at 21-22; Exs 10 (Construction Details for Remodeling Transformer Vault).] The IPL "waterproofing" details call for installation of a "6 X 6 -10/10 Mesh" along with "Expansion joint waterproofing" between the Vault and building. [Frank Dep. at 5 at 22; Ex. 10.]

Landmark designed and installed the current drain system with the approval and input of IPL in a 2002 renovation. [Lufcy Dep. at 20-21.] In that renovation, Landmark installed conduits through which electrical wiring runs from the Vault into Landmark's subbasement. [Dkt. No. 95 at 8 (citing Lufcy Dep. at 27-28, 31, 51; Frank Dep. at 41-42).] Senior electrical engineer of IPL, Mr. Lufcy, suggested in his testimony that IPL mandated and approved the changes to the drainage of the Blocks in 2002. [Lufcy Dep. at 21-22.]

IPL understood that any failure to maintain the Vault would jeopardize adjacent property owners such as the Blocks. [Schimizze Dep. at 38-39; Ex. 10.] Mr. Schimizze testified that allowing water build up in the Vault would obviously pose a risk to the Blocks:

> Q.· Would you agree that IPL would know that
> if there's water accumulation in vault A,
> it would potentially jeopardize adjacent
> building owners such as the Blocks?
> MR. CANTRELL:· Objection.· Lack of
> foundation.
> You can answer.
> A.· Well, I think that just from the
> physical situation there, IPL would know that a
> build-up of water in those vaults is a risk to
> not only their neighbors, but it would be a risk
> to their own equipment.· But that's a pretty
> basic understanding, and I'm sure that IPL has
> that expertise.

[Schimizze Dep. at 38-39.]

IPL's Section Leader of Network Operations Mike Lee explained that, in reference to flooding, IPL inspected the Vault on a two-year cycle. [Deposition of Michael Lee ("Lee Dep.") at 20-21.] Mr. Lee explained that the inspection consists of an observation of the Vault floor and identifies "[i]f there was standing water or the vault was flooded at the time that they inspected it." [*Id.* at 21] Mr. Lee also explained that IPL looked for deterioration of the concrete in the form of cracking and rusted I-beams, which would be reported to Tom Frank, IPL's senior engineer. [Dkt. No. 104 at 9-10 (citing Lee Dep.).]

Mr. Schimizze's file included IPL forms titled "Network Protector Maintenance" applicable to the subject vaults. [Schimizze Dep. at 19-20.] Within the network protector maintenance forms is a box identifying "last vault cleaning date." [*Id.* at 21.] The Network Protector Maintenance form is the only documentation Mr. Schimizze discovered in his investigation of the IPL maintenance and is the only source of information regarding IPL's schedule on which he could rely. [*Id.* at 26.] Mr. Schimizze testified that he knows of no other cleaning records other than those included in Exhibit 3 to his deposition. [*Id.* at 25.]

Mr. Schimizze's collection of the IPL forms created to document all cleaning between February 16, 2005 and April 21, 2009 indicate that IPL had not cleaned the drain in the Vault adjacent Landmark's subbasement for more than two years prior to the Incident. [*Id.* at 22, 27-28.] According to these records, the drain in the Vault was cleaned three times in four years. [*Id.* at 41.]

Additional conflicting records evidence that prior to the May 10, 2011 failure, the Vault last underwent a cleaning, inspection, and repairs on September 28, 2010. [Ex. 11.] In September and October 2010, approximately 24 man-hours were expended by IPL to

maintain and clean the Vault.  [*Id.*]  The Vault was not maintained or inspected again until the day after Landmark's loss on May 11, 2011 for "emergency-clear vault for customer." [*Id.*]

**IPL's Control of Access to the Vault.**

Mr. King, Landmark's Construction Manager, described access to the Vault as "out of Landmark's control" due to IPL's control of Vault access, as follows:

> Q    And was there ever any intention that you're aware
>      of for Mr. Rain to fix the vault?
> A    That was out of our control.
> Q    When you say "our control," are you talking about
>       yours or are you talking about Landmark's?
> A    Landmark's.
> Q    Why do you think it was out of Landmark's control?
> A    They didn't hold the key to the vaults.
> Q    And you had mentioned that, at least at the 2005,
>      2006 time frame after the east vault was repaired,
>      that IPL wouldn't let you in there?
> A    That's correct.

[King Dep. at 52.]  IPL's control of Landmark's access to the Vault is further corroborated by IPL's senior engineer, Mr. Frank, who testified that if Landmark wanted access to the Vault "they would probably go through Dave, [Lufcy] contact him, and he would either contact me or set up a network crew to go out and allow them in once we were assured that they were properly saftied [sic] up for access to the vault".  [Frank Dep. at 17.]  Mr. Schimizze testified that Landmark could not repair the Vault leakage in the manner he

prescribes without IPL's cooperation because Landmark "would not have access to the vaults." [Schimizze Dep. at 105.][4]

When IPL permitted Mr. King's crew to access the east Vault area to correct the floor slope in 2005, it required contractors to go through "confined space training." [King Dep. at 64-65.] IPL is the sole party maintaining the keys that access the locked-grate entry to the Vault. [*Id.* at 65.] Landmark does not have keys to the grate and was told by IPL not to enter the Vault without its permission. [*Id.* at 65-66.] When it came to accessing the Vault on Landmark's behalf, Mr. King was compelled to do everything IPL told him "when it comes to their electrical vaults." [*Id.* at 66.] Mr. King describes Landmark's limited access to the Vaults as follows:

> Q.    Okay. I appreciate your answer, but my question
>          was, were you ever denied access to the vaults?
> A.     Yes, we were denied.
> Q.    How were you denied access to the vaults?
> A      Because we were never allowed to go in to fix them.
> Q      Did you ever specifically ask to go into a vault
>          after the east vault was repaired?
> A      We wanted to continue the program because we had
>          concern about water coming through --
> Q      Right.
> A      -- we wanted to continue the program.
>
> . . .

---

[4] Mr. Schimizze recommended that to seal the taps (in his opinion, the source of water infiltration into the electrical switch gear area), one would have to enter the inside of the Vault and caulk the tap from the top (as opposed to caulking from the bottom in the subbasement ceiling), so as to not work against gravity. [Schimizze Dep. at 97-99.] In order to access the Vault to fix the gap between the conduit and the cement tap, Landmark would need to "get IPL to unlock the vault to get down into it" and cooperate with IPL to renovate the Vault. [*Id.* at 100, 104-05.] Mr. Schimizze testified that without IPL's cooperation, Landmark would not be able to fix the problem because Landmark would not have access to the Vaults. [*Id.* at 105.]

| Q | Right. But after April 25 of 2007, nobody bothered to talk to anybody about scheduling anything or doing any work in the vault or asking for access to the vault until the second explosion occurred?<br>MR. MAY: Objection. |
|---|---|
| A | There was phone conversations between Dave Lufcy and I. And I asked, why can't we do this? And he said it's not a priority to them. |

[*Id.* at 67-68.] IPL disagrees, contending that Landmark "had no issue accessing the Vault to make large-scale, structural modifications to the locked vaults and did not rely on IPL for design or construction of such modifications." [Dkt. No. 95 at 6 (citing King Dep. at 37-38; Lufcy Dep. at 32; Lee Dep. at 17).]

**2005 Electrical Blowout in the Blocks Building Subbasement.**

Water seepage from the Vault first became an issue in the Blocks Building around 2005 when an electrical blowout occurred in the subbasement. [King Dep. at 24.] Landmark hired its construction manager Gene King to address the Blocks Building water infiltration following the 2005 damage. [Affidavit of Dan Ross ("Ross Aff.") at ¶¶ 2-8.] Mr. King determined that the blowout was caused by water seeping into the basement from the Vault. [King Dep. at 31-32.] He observed water from the vault "coming through the ceiling" of the Blocks electrical room. [*Id.* at 35.] The water entered Landmark's switchgear room through cracks in "portions of the floor under the west room vaults." [*Id.* at 41-42.] Mr. King observed cracks all over the Vault looking up at the floor from the Blocks switch gear room. [*Id.* at 43-44.]

Mr. King's observation led him to "work with IPL in getting the vaults cleaned up and water proofed." [*Id.* at 25, 35.] "[T]here was a plan to get into the vaults and repair

them and waterproof the floors to stop the water flow." [*Id.* at 36.] During the waterproofing project, Landmark gained access to the Vault because IPL opened the Vault. [*Id.* at 38.] With IPL's permission, Landmark was able to alter the slope of the east-most Vault floor and apply waterproofing to the deck. [*Id.* at 37.] After finishing the east-most Vault floor, Mr. King was not able to complete work in waterproofing the west-most Vault floor that is directly above Landmark's switchgear room "because IPL did not come back and unlock the vaults for us to waterproof." [*Id.* at 25-26.] When IPL rejected Landmark's efforts to address the west-most Vault floor, Dave Lufcy (IPL's engineer) informed Mr. King that IPL "moved on to other items that have more priority." [*Id.* at 57.]

**The Cause of the Water Damage to Landmark's Electrical Equipment.**

On May 10, 2011, water entered the subbasement of the Blocks and damaged Landmark's electrical equipment. The parties dispute what caused water to enter Landmark's subbasement.

Landmark's expert witness, Mr. Norman, averred that several areas in the Vault demonstrated deterioration including the concrete slabs and beams, corrosion of metal components below the Vault, mineral deposits that form on surfaces with water movement through the concrete, and the damage located away from the drains where the water would not enter if the drains functioned. [Norman Aff. at Ex. B, p. 5.] Mr. Norman opined that IPL's failure to prevent debris blockage of its drains directly and proximately resulted in "water that readily enters the vaults." [*Id.*] The water that damaged the Landmark's electrical equipment originated in the west-most Vault which Mr. Norman contends IPL failed to maintain. [*Id.* at p. 3.]

9

IPL's expert, Mr. Schimizze, testified that IPL's poor maintenance had "some impact" on water seepage into the Blocks Building. [Schimizze Dep. at 32.] Mr. Schimizze testified that the Vault was inadequately maintained, based on his inspection. [*Id.* at 32 ("I could see from my examination what the condition was of the drains and the vaults at the time of my inspection. Q. And you determined that the condition was poor? A. That's correct.").] Based on IPL's records, Mr. Schimizze opined that the "number of times they [IPL] inspected was irrelevant because obviously it wasn't enough." [*Id.* at 34, 36.] Mr. Schimizze noted that the condition at the time of his inspection was "not good[] [a]nd that build-up at the drains is a regular problem." [*Id.* at 33] However, Mr. Schimizze had no opinion on the frequency of maintenance required to avoid water accumulation. [*Id.* at 36-37.][5]

IPL senior engineers David Lufcy and Tom Frank concluded that the water infiltration into Landmark's subbasement occurred at the location where Landmark compromised the integrity of the Vault floor in 2002. Mr. Schimizze contends that water entered Landmark's subbasement through the Landmark-installed conduits in the Vault floor. [*Id.* (citing Schimizze Aff. at ¶ 6; Schimizze Dep. at 29-30 (opining that the Vaults

---

[5] Landmark claims that "Schmizze [sic] admits that drain clogging caused by IPL's negligent maintenance is necessary to create the condition under which water seeps through tap [sic] into the electric room short of hurricane conditions." [Dkt. No. 104 at 13 (citing Schimizze Dep. at 65).] We have reviewed Mr. Schimizze's deposition at page 65 and Landmark's characterization of Mr. Schimizze's testimony is inaccurate. Mr. Schimizze testified that "I would say without some major course, the drain should be adequate even, you know, short of a hurricane. But there could be water coming off the building, getting down in there that could overwhelm the drains. I don't know that answer, so that's why I can't give you a conclusive answer that you're looking for." [Schimizze Dep. at 65.]

are exposed to the elements and that the wetness from the Vaults are going to go down the drain and seep into the concrete at each tap)).] According to IPL, before Landmark's installation of "pilasters" (the conduit through which electrical wiring runs), the Vault had no history of water intrusion. [Dkt. No. 95 at 8 (citing Lufcy Dep. at 25-26; Frank Dep. at 32).]

Landmark argues that IPL has presented no opinions as to the origin of the water that damaged Landmark's electrical equipment located below the Vault. [Dkt. No. 104 at 15-16.] Specifically, Mr. Lufcy testified that he had no opinion where the water that damaged the electrical equipment originated. [*Id.* at 15 (citing Lufcy Dep. at 52).] Further, Mr. Frank did not conduct an investigation into the extent of water migrating through the floor of the Vault into the Blocks subbasement and could not ascertain the degree of water seepage through the Vault floor into the Blocks subbasement at the time of the loss in May 2011. [*Id.* at 15-16 (citing Frank Dep. at 44-45).] Finally, Mr. Schimizze did not inspect the failed electrical components and could not testify to the specific flow of water that damaged the equipment. [*Id.* at 16 (citing Schimizze Dep. (Landmark did not provide any page citation)).]

### Plaintiff's Request for Summary Judgment

It seems, although it is unclear, that Landmark is seeking summary judgment in response to IPL's Motion for Summary Judgment. In its Revised Plaintiff's Response to Defendant IPL's Motion for Summary Judgment and Counter Motion as to Liability, Landmark stated:

> The only conclusion the Court could draw from the above elements is that IPL's negligence caused the failure of switch gear equipment in the Blocks subbasement on May 10, 2011. With IPL's expert agreeing that Landmark was barred from entering the vault and prescribing a remedy that can only be implemented from inside, there can be no genuine issue regarding Landmark's "incurred risk". Therefore, *IPL's motion is not well taken and it should be found liable as a matter of law* so a hearing on Plaintiff's damages may proceed.

[Dkt. No. 104 at 26 (emphasis added).] Despite the fact that Landmark argues that it has "demonstrated genuine issues of material fact on which the Court cannot grant dispositive relief," Landmark states in three sentences that it should be granted summary judgment. Not only does such a request go against the basis of Landmark's opposition, but Landmark's approach fails to comply with Southern District of Indiana Local Rules 56-1 and 7-1.

Southern District of Indiana Local Rule 7-1 provides that "[m]otions must be filed separately, but alternative motions may be filed in a single paper if each is named in the title. A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court." S.D. Ind. L.R. 7-1(a). Landmark's request for summary judgment set out in its response to IPL's motion was not made by a separate motion. Further, Local Rule 56-1 requires a section labeled "Statement of Material Facts Not in Dispute" and citation to supporting facts. Landmark has not satisfied S.D. Ind. L.R. 56-1. Consequently, we will not consider Landmark's request as framed in its response brief to be a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *Id.,* at 247, nor the existence of "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst*

*Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

"[S]ummary judgment is rarely appropriate in negligence cases due to the multitude of factual issues which need to be resolved by the jury." *Jakubiec v. Cities Serv. Co.*, 844 F.2d 470, 473 (7th Cir. 1988). "Proximate cause is ordinarily a jury question unless the answer is so clear that reasonable minds would unanimously agree on it." *Id.* (citations omitted). As Landmark notes, on summary judgment we will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder." [Dkt. No. 104 at 17 (citing *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003)).] However, "[t]he existence of a duty is a question of law for the court to determine" and "[t]hus this issue is one that is generally appropriate for a motion for partial summary judgment." *In re Greenwood Air Crash*, 924 F. Supp. 1511, 1516 (S.D. Ind. 1995) (citations omitted).

**Analysis**

IPL seeks summary judgment in its favor on Landmark's claims for negligence. "In order to establish a cause of action based on negligence in Indiana, a plaintiff must prove by a preponderance of the evidence that 1) the defendant had a duty to conform his conduct to a standard of care arising from his relationship with the plaintiff; 2) the defendant failed to conform his conduct to that standard; and 3) the plaintiff suffered an injury proximately

caused by the breach." *Parojcic v. Bethlehem Steel Corp*, 128 F.3d 601, 603 (7th Cir. 1997) (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)). IPL's motion for summary judgment is based on three arguments: first, that there is no evidence that IPL owed a duty to Landmark; second, that the undisputed evidence establishes that Landmark's water issues were due to its own actions; and third, that Landmark assumed the risk of the damage for which it complains. [Dkt. No. 95 at 4.] Genuine issues of material fact exist as to each of these three arguments which preclude the entry of summary judgment.

## A.    IPL's Duty Owed to Landmark.

IPL argues that because it did not "possess or exclusively control the Vault," it owed no duty to Landmark to maintain the Vault. [Dkt. No. 95 at 4.] Indiana law provides:

> The question of whether a duty is owed in premises liability cases depends primarily upon whether the defendant was in control of the premises when the accident occurred. "The rationale behind this rule 'is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm.'" *Although whether a duty exists usually is a question of law, the existence of a duty sometimes depends upon underlying facts that require resolution by the trier of fact, and this may include questions regarding who controlled property at the time and place of an accident.* "Possession and control of property for premises liability purposes has been described as a question of fact involving occupation and intent to control the particular area where the injury occurred."

*Yates v. Johnson County Bd. of Com'rs*, 888 N.E.2d 842, 847 (Ind. Ct. App. 2008) (internal citations omitted) (emphasis added). "Actual physical possession of property at the precise moment an accident happens is not always dispositive on the question of 'control' for premises liability purposes, if there was evidence that another party was in a better position to prevent the harm that occurred." *Id.* (citation omitted).

We begin with the issue of ownership of the Vault, which clearly remains a disputed fact. IPL asserts that it did not own the Vault. [Dkt. No. 107 at 2 (citing Deposition of Ricky J. Leffler at 64; Lee Dep. at 12; Frank Dep. at 15; Lufcy Dep. at 35).] Yet, Landmark states that circumstantial evidences "points to IPL as the Vault owner." [Dkt. No. 104 at 25 (citing 1956 permit; IPL design drawings; IPL biennial maintenance protocol; Schimizze Dep.).] IPL apparently concedes this issue is disputed because it states in its Reply that "the issue of ownership remains in dispute." [Dkt. No. 107 at 8.]

Control of the vault is similarly in dispute. IPL argues that "no party really had 'control' of the Vault, although IPL maintained the locks for the Vault for safety concerns." [Dkt. No. 95 at 5.] On its face, IPL's statement highlights a disputed fact – IPL both contends that it maintained the Vault's locks, yet also claims that no one controlled the Vault. IPL requires contractors to go through "controlled space training" before entering the Vault and IPL is the sole party with keys to access the Vault. [King Dep. at 64-65.] IPL claims that it "does not deny access to the Vault so long as proper safety precautions are taken" which is disputed by Landmark. [*Compare* Dkt. No. 95 at 6 (IPL citations to deposition testimony that IPL did not deny access to the Vault) *with* Dkt. No. 104 at 8 (Landmark noting that IPL's Mr. Lufcy recommended that Landmark wait to epoxy the floor to coordinate with IPL's work) *and id.* at 6 (citing Mr. King's testimony that IPL would not let him into the Vault in 2005/2006 after the east vault was repaired).] The fact that IPL has access, which it claims it did not deny to Landmark, emphasizes the possibility that IPL has exclusive control over the Vault – a fact that must be determined by the trier

of fact. IPL's assertion that it "did not retain exclusive control over the Vault" is simply not supported by undisputed facts.

IPL relies heavily on a Texas Court of Appeals case, *RT Realty, L.P. v. Texas Utilities Electric Co.*, 181 S.W.2d 905, 909 (Tex. App. 2006). But, the *RT Realty* case is inapplicable here. Setting aside the fact that a Texas Court of Appeals decision is not controlling authority for us, the court's conclusions in *RT Realty* are based entirely on the filed rate doctrine. Specifically, in affirming the trial court's decision, the Texas Court of Appeals stated, "we conclude the trial court granted summary judgment in favor of TU Electric because the terms of TU Electric's tariff governed Appellant's claims and that TU Electric was not liable pursuant to its tariff." *Id.* at 912. The Court of Appeals in *RT Realty*, in fact, could not have been more clear that its decision was based on the filed rate doctrine and an analysis of defendant's tariff. *See generally id.* (repeatedly referencing defendant's tariff and noting "the tariff is the contract that governs the parties' relationship"). *RT Realty* is totally inapplicable here and thus does not support a finding that IPL did not possess or exclusively control access to the Vault.[6]

Genuine issues of material fact exist as to whether IPL possessed or exclusively controlled the Vault which preclude the entry of summary judgment.

---

[6] Landmark seeks to strike IPL's argument based on the *RT Realty* case and requests "costs awarded to plaintiff for expense in responding to the spurious argument." [Dkt. No. 104 at 20.] We deny Landmark's request because motions to strike are disfavored, we do not entertain motions made within responses, and Landmark cites to no authority on which we would award attorneys' fees nor any evidence that IPL's failing argument was made intentionally and with bad faith.

**B.     IPL's Assumption of a Duty to Landmark Regarding the Vault.**

IPL argues that it did not assume a duty to Landmark with regard to the Vault and

therefore it cannot be liable for damage to Landmark's subbasement and its equipment.

Under Indiana law,

> A duty to exercise care and skill may be imposed on one who, by affirmative
> conduct, assumes to act, even gratuitously, for another.  *The actor must
> specifically undertake to perform the task he is charged with having
> performed negligently,* for without actual assumption of the undertaking
> there can be no correlative legal duty to perform the undertaking carefully.
> In other words, the assumption of a duty creates a special relationship
> between the parties and a corresponding duty to act in a reasonably prudent
> manner.  The existence and extent of such duty are ordinarily questions for
> the trier of fact, but when there is no genuine issue of material fact,
> assumption of a duty may be determined as a matter of law.

*Cox v. Mayerstein-Burnell Co., Inc.*, 19 N.E.3d 799, 808 (Ind. Ct. App. 2014) (citing *Hous.*

*Auth. of City of South Bend v. Grady*, 815 N.E.2d 151, 160 (Ind. Ct. App. 2004)) (emphasis

in original).[7]  Genuine issues of material fact exist such that a determination as to whether

IPL assumed a duty of care cannot be determined as a matter of law.

IPL claims that "there is no evidence that IPL intended to assume a duty with regard

to maintenance of the Vault."  [Dkt. No. 95 at 7.]  Landmark submits that substantial

evidence raises questions of material fact as to IPL's conclusion that it did not assume a

duty to maintain the Vault.  First, Landmark argues that because IPL is the owner and/or

primary maintainer of the Vault, IPL need not gratuitously assume a duty to maintain the

---

[7] IPL cites to *Smith v. Delta Tau Delta*, 988 N.E.2d 325 (Ind. Ct. App. 2013) related to
Indiana's law regarding assumed duty of care.  The Indiana Supreme Court granted transfer in the
*Smith* case and vacated the Court of Appeals' decision.  *See Smith v. Delta Tau Delta, Inc.*, 9
N.E.3d 305 (Ind. 2014).  Consequently, it is inappropriate to cite to this vacated decision.

Vault; IPL had a duty to maintain the Vault as the premises owner. [Dkt. No. 104 at 21.] We found and the parties have agreed that a material question of fact exists as to whether IPL was the owner of the Vault.

Two issues exist with respect to maintenance of the Vault – clearing the drains and epoxying the floor. First, IPL claims that it cleared the drains in the Vault only when it serviced the Vault for other purposes, which was infrequently and on an irregular basis. [Dkt. No. 95 at 7 (citing Lufcy Dep. and Lee Dep.).] Landmark points to evidence that IPL provided more regular Vault maintenance than infrequent service. For example, IPL's Mr. Lee described a two-year vault inspection protocol which looked for flooding and cracking. [Lee Dep. at 20-21.] IPL records also indicate that the Vault underwent "clean and inspect" and repairs on September 28, 2010 – less than a year before the May 10, 2011 Incident. [Dkt. No. 104 at 10 (citing Ex. 11).] Mr. Lee also testified that approximately 24 man-hours were expended by IPL in maintaining and cleaning the Vault between September and October 2010. [Dkt. No. 104 at 11.]

Second, IPL contends that it did not specifically and deliberately undertake the responsibility to apply epoxy to the Vault. It is IPL's position that it coordinated its maintenance schedule with Landmark so that *Landmark* could epoxy the Vault in 2006 and 2007 – which does not establish an assumed duty by IPL. [Dkt. No. 95 at 7.] Landmark argues, however, that it was stymied from entering the Vault to complete waterproofing because IPL recommended that Landmark wait until IPL conducted its transformer project. Further, IPL's Mr. Lufcy did not think epoxying the floor would solve Landmark's problems. [Dkt. No. 104 at 8 (citing Lufcy Dep.).] Landmark submits that after the

Incident, on July 23, 2012, IPL paid for the application of epoxy to the "middle bay vault floors." [*Id.*]

Landmark has presented sufficient evidence to demonstrate a genuine issue of material fact as to whether IPL assumed a duty of care to maintain the Vault such that IPL was required to act in a reasonably prudent manner. Certainly IPL took at least some steps to maintain the Vault. The question of whether IPL's actions constitute an assumption of the duty to maintain the Vault will be left for the trier of fact to answer.

## C. Causation.

As stated above, summary judgment is generally inappropriate for negligence cases because issues of causation and credibility determinations are more appropriately left for the trier of fact. This prudent rule is particularly applicable here. The facts recited *infra* clearly demonstrate the parties' conflicting evidence of causation. We will not repeat all of those differing opinions, but summarize the parties' respective positions below.

IPL claims that even if it "had a duty to clear the Vault drain of debris, there is ample evidence that the water infiltration at issue, and any resulting damage, was due to Plaintiffs' own modifications to the Vault floor and not any alleged failure to properly clear the Vault's drain of debris." [Dkt. No. 95 at 8.] IPL concludes that because the water infiltration is located around the pilasters, "it is clear that the water infiltration at issue in this matter, and any resulting damage, was due to Plaintiffs' own modifications to the vault floor." [*Id.* at 8-9; *see* Schimizze Aff. at ¶ 6; Schimizze Dep. at 29-30 (opining that the Vaults are exposed to the elements and that the wetness from the Vaults are going to go down the drain and seep into the concrete at each tap).]

In response, Landmark raises questions of credibility relating to IPL's expert witnesses' opinions – specifically their lack of an investigation of the Vault and admissions that the build-up at the Vault drains was a regular problem. [Dkt. No. 104 at 22; *see also* Schimizze Dep. at 25, 34.] Moreover, because IPL orchestrated and approved Landmark's 2002 drainage work to the Vault, IPL was closely involved in those renovations and share responsibility for the design of the drain system. [*See* Dkt. No. 104 at 22-23.] Because no history of water infiltration existed after the 2002 renovations by Landmark until 2005, Landmark discounts IPL's conclusion that it was Landmark's work that caused the water infiltration. Finally, Landmark's expert witness, Mr. Norman, concluded that the proximate cause of the Incident was IPL's negligent upkeep of the Vault's drains. [Norman Aff. at Ex. B.]

The cause of the water infiltration into the Vault that ultimately led to the damage of Landmark's electrical equipment is replete with disputed material facts that shall be left for the trier of fact to determine. The parties' opposing expert witness opinions is a classic "battle of the experts" which precludes the entry of summary judgment. *See Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 951 (N.D. Ill. 2010) ("It is indeed true that a 'battle of the experts' can preclude summary judgment.").

**D.    Assumption of Risk.**

IPL argues that Landmark knew about the water infiltration issue at the Vault and did nothing for four years prior to the May 2011 Incident and thus, incurred the risk of damage. Under Indiana law:

[Incurred risk] involves a mental state of venturousness on the part of the actor, and *demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk.* "By definition . . . the very essence of incurred risk is the conscious, deliberate and intentional embarkation upon a course of conduct with knowledge of the circumstances . . . ." "*It requires much more than the general awareness of a potential for mishap.* Incurred risk contemplates acceptance of a specific risk of which the plaintiff has actual knowledge." While the failure to recognize a danger or risk readily discernible to the reasonable and prudent man under like or similar circumstances may constitute contributory negligence, it cannot be said to constitute incurred risk . . . .

*Simpson v. OP Prop. Mgmt., LLC*, 939 N.E.2d 1098, 1105-06 (Ind. Ct. App. 2010) (quoting

*Power v. Brodie*, 460 N.E.2d 1241, 1242-43 (Ind. Ct. App. 1984) (emphasis added)).

"Incurred risk can be found as a matter of law *only if the evidence is without conflict* and

the sole inference to be drawn is that the plaintiff knew and appreciated the danger caused

by the defendant's negligence, but nevertheless accepted it voluntarily." *Id.* (citing

*Ferguson v. Modern Farm Sys., Inc.*, 555 N.E.2d 1379, 1381 (Ind. Ct. App. 1990)

(emphasis added)).

The evidence is not without conflict and it can hardly be said that the sole inference

to be drawn is that Landmark knew and appreciated the danger caused by IPL's apparent

negligence and accepted it voluntarily. IPL's own argument highlights concerns and

demands by Landmark to rectify the water intrusion. Specifically, on February 3, 2006,

Robert Rains, a principal of Landmark, wrote to David Lufcy at IPL stating, "[t]he leakage

from [the Vault] is causing a potentially damaging condition in the Block Building and

must be rectified immediately." [Dkt. No. 95 at 9 (citing Ex. G).] On April 25, 2007, Mr.

King wrote to IPL stating "[w]e still have a water issue that I want to get resolved." [*Id.*

citing King Dep. at 56-57).] According to IPL, "Plaintiffs [sic] did not direct [Mr. King]

to take any action with regard to the water issue in 2008, 2009, 2010, or prior to the accident in 2011, even though the issue remained unresolved." [*Id.* at 10 (citing King Dep. at 39, 69); *see also* Robert Rains Deposition at 23-24 (admitting that Landmark "gave up" after 2007 when it came to rectifying the water infiltration issue).] IPL concludes that the correspondence evinces Landmark's knowledge of the water leak and an appreciation of the danger and that nothing was being done to remedy the risk. [*Id.*]

Landmark, on the other hand, characterizes the above-referenced correspondence as evidence of Landmark imploring IPL to address the water intrusion issue. Contrary to IPL's statement that Landmark did not act between 2007 and 2011 to address the water infiltration issues, Mr. Lufcy confirmed verbal communications between 2007 and May 2011 wherein Landmark requested access to the Vault. [Dkt. No. 104 at 24-25.] Landmark claims that its efforts to correct the water intrusion issue were met with resistance from Mr. Lufcy who sought to have Landmark coordinate its work with IPL's transformer maintenance project. [*Id.* at 24.] According to Landmark, Mr. Lufcy would not respond to Mr. King's final written request for IPL's intentions with respect to the remaining waterproofing to be completed in the Vault. [*Id.* at 16 (citing Ross Aff.).] Landmark notes that in 2012 IPL completed the work Landmark attempted to do prior to the Incident, epoxy the Vault floor, but only *after* the Incident. Landmark establishes at a minimum conflicting evidence and a reasonable inference that Landmark did not accept the risk of damage.

In its reply brief, IPL submits new, additional evidence of Landmark's knowledge of the water intrusion into its Electrical Room. [Dkt. No. 107 at 6-7.] IPL details that Landmark's property manager, Emily Miller, observed water "coming down the walls" in

the "back corner of the Electrical Room" every month between 2006 and 2009 such that Landmark put a dehumidifier in the room and spoke with Landmark's owner, Dan Ross, about these issues on a daily basis. [*Id.* at 6 (citing Deposition of Emily Miller ("Miller Dep.") at 26-30).] Landmark's owner testified that there were "a lot of things" that could have been done to address the water infiltration issue and Landmark has installed a "pan system" following the Incident to divert water from the ceiling into a drainage system. [*Id.* (citing Deposition of Daniel Ross at 45; Miller Dep. at 36-37).]

IPL seeks to use this evidence to show that "Landmark incurred the risk of IPL's alleged negligence and is at greater fault than any others whose fault proximately contributed to its damages." [*Id.* at 7.] Degrees of fault cannot be decided on summary judgment. "Contributory negligence is a question of fact for the jury to decide. It will only be a question of law appropriate for summary judgment if the facts are undisputed and only a single inference can be drawn therefrom." *Whitmore v. S. Bend Public Transp. Corp.*, 7 N.E.3d 994, 997 (Ind. Ct. App. 2014) (citation omitted). Here the facts *are* disputed and more than one inference can be drawn from the facts. Landmark repeatedly contacted IPL, inspected the Electrical Room monthly, and installed a dehumidifier, all after waterproofing a portion of the Vault's floor. We can hardly find that the sole inference is that Landmark knowingly accepted the risk of damage.

The standard to establish that "the evidence is without conflict and the sole inference to be drawn is that the plaintiff knew and appreciated the danger caused by the defendant's negligence, but nevertheless accepted it voluntarily" is a steep one. We will not say that the evidence establishes no conclusion other than that Landmark accepted the danger of

flooding caused by the condition of (or IPL's maintenance of) the Vault. The question of whether Landmark assumed the risk of damages will be left for the trier of fact's determination.

## Conclusion

The disputed questions of material fact related to Landmark's negligence claim are abundant. These questions are unmistakably within the purview of the trier of fact. As a result, we DENY Defendant IPL's motion for summary judgment.


Date:  _____05/22/2015_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Cristina A. Costa
KIGHTLINGER & GRAY
ccosta@k-glaw.com

Pfenne Peter Cantrell
KIGHTLINGER & GRAY
pcantrell@k-glaw.com

Thomas J. Jarzyniecki, Jr.
KIGHTLINGER & GRAY
tjarzyniecki@k-glaw.com

Douglas J. May
LAW OFFICES OF DOUGLAS J.MAY
dmay@travelers.com